Counsel, may it please the court. My name is Jeffrey Ellis. I'm here today with Robert Gombiner, and we represent Clark Elmore in this case. Because trial counsel failed to object, because trial counsel deficiently failed to object to Mr. Elmore wearing shackles, the first site that his jurors, the jurors who would decide whether he lived or died, had of Mr. Elmore was Mr. Elmore fully shackled, a man so dangerous that he had to be chained at his ankles, at his waist, and at his wrist. On this issue, if it occurred today, it would be structural error, putting aside counsel's accession to it. What do we do with the Washington Supreme Court's conclusion that under pre-deck law, this was not prejudicial? Do we find that to be an unreasonable conclusion of fact or an unreasonable application of law, under your view? Well, there really are two conclusions, one from the direct appeal, one from the post-conviction proceeding. The direct appeal is the due process claim, where they say that despite the fact that they found that it was a constitutional error, they said the burden of proving harm fell on Mr. Elmore at that time. So there's that. Well, and wasn't that the pre-deck law, that once having demonstrated error, you still had to demonstrate prejudice from it? Well, no, it wasn't. Pre-deck law was Chapman, was that where there was a constitutional error, the state had to prove beyond a reasonable doubt it was harmless. The difficulty I have with that is that the pre-deck law was that shackling at sentencing wasn't constitutional error. Well, except that's not how the Washington Supreme Court treated it on direct appeal. I understand. But they may have, Washington, of course, is free to have its own view of what the Constitution requires. But it seems to me that it's pretty clear that before deck, this wasn't constitutional error. Wasn't that the state of US constitutional law? I respectfully disagree. And so did the Washington Supreme Court, in the sense that they found that there was a constitutional error. And they actually relied on this court's president, inducted versus Guindinia's, which applied the correct harm standard. And I think you have to draw back a little bit and ask, what really is the constitutional due process error in any case where there are security measures that are unwarranted? It's important to underline that last point, that the state court didn't find, nor does the state allege, that these shackles were in any way justified. Counsel, even if we assume that the later cases apply, the court seems to have instructed us that it's when the court compels the prisoner to appear in shackles that seems to be the problem. This decision was, if I understand the record correctly, a decision made by defense counsel with his team to present him in a way that showed, if you will, excess humility, a sense of remorse. That was their strategy. If I understand correctly, the government said, you know, you really want him here like this, you know? Nobody was forcing him to appear in shackles. There was a strategic decision to have him do that one day, but then to appear in his prison uniform the balance of the time. Do I misunderstand something? You do. And so did the state court. And I think you have to look at that in-chambers conference, which precedes the first appearance in front of the veneer. Because the state court misreads it, and they mischaracterize it in their opinion. Because they said, just as you did, that Mr. Elmore agreed to be shackled. He did not. Where is that in the record? I don't have the case number. Where is there an objection in the record? Pardon me? Where is there an objection in the record? There is no objection. So where is the space between did not agree and did not object? Well, here's what happens. There's a conversation about wearing jail clothes. And that conversation is defense counsel saying, we've considered this matter, we've spoken to Mr. Elmore about it, and he is agreeing to wear jail clothes. And the court asked Mr. Elmore, is that correct? And he says, yeah, I agree to wear jail clothes. And then the issue of shackles is brought up as an additional matter. Nobody asked Mr. Elmore what his position is on that. If you read his post-conviction declaration. Do they have to ask him? I understand the record. I understand your ineffective assistance of counsel claim related to that. But I guess I have a narrower question. Once his lawyer exceeds, once his lawyer says, we'll leave him on today, which I think the record shows, doesn't that kill your due process claim? No, for two reasons. That's not what he said. He said, I don't have any objection. I think it is up to the jail officers to decide what security. That's pretty close to exceeding, isn't it? All right. But let's look at what the state court did on that due process analysis. All right. And then we can flip it over to ineffective assistance of counsel. What they did on that was they did not find that it was invited error. And the state has not argued that it is invited error. They did several times, the Washington Supreme Court found a due process violation. Not so sure they did. Because they make the point that the ball's in the defendant's court to object to say something. And the inference I draw from their opinion, he didn't. And then they went on to discuss prejudice. But I don't see any kind of articulated determination that no matter what happened there, we've got a due process error. Well, again, I respectfully disagree that they've been. Don't point to me where in the Washington Supreme Court opinion you think it articulates a conclusion that there was a due process violation. Well, I apologize. I don't have the opinion in front of me. But the direct appeal opinion. It has the admonition that trial courts are supposed to go on the record and make an analysis. And then it goes on to say, our admonition to trial courts, however, does not relieve defense counsel of the obligation to object or request a curative instruction regarding shackling. And then it goes on to talk about a Sites of Ninth Circuit case and talks about prejudice. I don't read that to say that the Washington Supreme Court concluded there was a due process violation. And the district court didn't read it that way. It said something specifically to the contrary. Well, again, I respectfully disagree. But you've got to tell me why you disagree. I mean, you disagree, fine. But is there something I should be looking at? Because what I read doesn't give me a conclusion that the Washington Supreme Court decides there's a due process violation. I've been reading from, I've got the P2 version from page 305. Yeah, well, here's the quote that we rely on. And I think it's fairly definitive. In the present case, and this is, again, from the direct appeal, the appearance of Elmore and Shackles on the first day of what year, though error was harmless. So they clearly are saying on that page, and I think it's 274, but they clearly say, though error was harmless. And then they decide that it wasn't harmful. Or was that error on an IAC claim? Or was that a due process error? That's the due process claim. The IAC is in the second opinion. The IAC is in the state post-conviction proceeding. And I'm actually trying to get to that. Your question, Judge Hurwitz. Maybe it was there then. Because that's what the case may have some more traction. And let's talk about, then, the setup, if you will, in the post-conviction, which is where, again, the state court finds that there's no justification for Mr. Elmore to be shackled. And we'll start from the presumption, and I think it's a fair presumption, that counsel was ineffective in failing to object. The Washington Supreme Court, in the post-conviction review opinion, the second one, I know you call it personal restraint, but I can't get my arms around that, says, yeah, but it was only one day, and it was brief, and it was off the rest of the time. And we, therefore, find that you haven't demonstrated strickling prejudice, which is the burden of the defendant. How do we find that unreasonable? That was the question I was asking before. So now that we've gotten to it, tell me how. Well, there really are two components to the state court analysis. One is this idea that, because Mr. Elmore had claimed that he was remorseful, the sight of shackles, and I'll quote the Supreme Court here, offset any implication of dangerousness. That simply defies common sense. I mean, that really suggests that all 12 jurors, when they first see Mr. Elmore, see him fully shackled and flanked by two jail guards, conclude that those shackles were adornments that the jail offered to prisoners to wear into court to show that they were remorseful. What do we then take of, how long does the penalty phase trial last? Well, the- How long does it last? The trial itself lasts about, really, about three days. OK. And on the second day, he shows up unshackled. Well, right. And the third day, unshackled. Actually, the first day is before voir dire, isn't it? Right. So you've got a long period of time before they come back. And you have, I was asked, how many days of voir dire, and how many days of trial? Right. Let's talk about the voir dire, because again, I think the state court is mistaken when it analyzes that. What happens in voir dire is Mr. Elmore appears in shackles for the first appearance. Then the jury has read this description of the crime. Mr. Elmore's pled guilty. Here's what he did. Then they're asked to leave and fill out a juror questionnaire. Each individual, their juror is then brought back. So they only appear again, even though there's about a two-week period. They only appear again for one particular time, when they're individually questioned. And he's still in shackles at that point. No, at that point. I need you to walk through how long the jury saw him in shackles, and how long the jury saw him out of shackles. Well, they saw him in shackles. Because what I see the Washington court doing, I might not have agreed with it, I might have come out differently, is saying, well, it's a relatively brief view at the beginning of the case. And any implication of dangerousness is dispelled by the fact that by the time they see him again and see him over a more extended period of time, he's not shackled. So deal with that. Yeah. That's what the Washington court said. I'd like you to deal with that finding. And I guess what I'm saying is, they saw him for the first day. They were introduced to him in shackles. That original proceeding lasted just over a half hour. They were then dismissed. They then came back, each juror one by one, for about 10, 15 minutes for individual voir dire. Then they had about two and a half, three days of penalty phase. OK, now stop for a second. During the individual voir dire, was he in shackles? He was not. OK. He was in a stun belt. OK, and then would they come back later for a two or three day penalty phase trial? Right. And he's not in shackles at that trial? He is not. OK, so we all agree on the facts. Tell me why the Washington court was unreasonable in reading those facts to suggest that your client hadn't demonstrated prejudice. Because it defies common sense to conclude that the jurors seeing this man at their first impression would somehow conclude that their first impression was wrong when nothing was done to dispel it. It's important to read these cases in terms of what actually happened. So I appreciate your questions about the timing, but let's talk about what happened during this period of time. Because Mr. Elmore comes out, and we know that common sense tells us that human beings make judgments based on first impressions. And we don't change our first impressions unless they're dispelled by some contrary evidence. In this case, all of the evidence supported that impression. Because they see Mr. Elmore, again, fully shackled, not just at the legs, not just suggesting that he perhaps was an escape risk or that this was just a security measure by the jail, but shackled at the waist and at the wrist, which implies that he was in danger of being violent. They are then told, here is the very violent crime, the rape murder that he committed. So was this, at that point, an irremediable error in your view? I think that a curative instruction would have gone a long way, especially given the timing element. If the court had said, that was just a security measure, we were in a different room, you have to keep in mind that on the very first day, they're in the county council room, because there's a number of jurors, the entire veneer is there. If the judge had given some curative instruction that said, don't draw from that, the inference that the case law recognizes always exists, which is that this man is dangerous, that might have gone a long way to curing the prejudice. With respect, you're obviously a very able lawyer. And one of the things that Supreme Court tells us about AEDPA review is that they'll be very capable lawyers who will basically revisit the past and look at everything that was done and poke holes in it. And understandably, that's your job. But on the other hand, we have to review what happened here through the lens of AEDPA, which is highly, highly deferential. In this case, the Washington Supreme Court, after having sent the case back to the Superior Court for a hearing to review at least the mental portion of the claim to determine whether there was a violation of the first prong of Strickland, decided 8 to 1 that there wasn't any. They were aware of the shackling. They were aware of all of that. And they concluded that under the standards of Washington State that existed at that time, that there was no problem. Is it the way you would have done it? I'm sure not. Is it the way Judge Hurwitz would have done it? I'm sure not. But the reality is that's not what we're required to do here. We're required to give double deference, if you will, to the state court unless it violates one of the two prongs of AEDPA. I hear your argument about shackling. You did a good job with the brief. I want to know how we get around AEDPA to do what you want us to do with the shackling incident. Well, I think Walker v. Martel, which is a recent case that comes up in the exact same posture as this case, it's a pre-deck trial. It's raised his IAC. I wrote Pinholster, so I know a little bit about that case. And the Supreme Court made it very clear in Pinholster that what I did, which was to use Rompea, Wiggins, Williams, and so on to construe how we interpret Strickland, is not permitted. We have to look at the case law that existed at the time that this occurred. And what I'm struggling with is you're saying, here's the way we view the world today, and I want you to judge what they did then by the world today. And I don't think we can do that under Pinholster, can we? No, but the review of the world as it existed then is set out in Walker v. Martel, because it, too, is an ad behabeus case, so it can't break any new law. Can you cite to me, counsel, any case where a lawyer that makes a strategic decision to put his client in chains, in a prison uniform before the jury in order to elicit sympathy, he's had a private jury in panel. He has two jury consultants. They run through the trial, and the jury says, boy, your regular stuff's not going to work. You better try remorse. Show remorse. So they make a strategic decision to do this. Now, it probably wasn't a very smart decision, but it was a strategic decision. Where's the case law that existed at that time that says a strategic decision of that nature violates what we consider to be AEDPA standards? But it's a strategic decision, and I would disagree with that, because counsel says that a thought about the issue of wearing jail clothes, he said that he was surprised by the chains. The state court said it was deficient performance. You don't have to give deference to counsel's decision making, because the state court tells you that it was deficient to fail to object. And I accept that. I mean, and that's why I think you get past that issue. But Walker finds that the use of restraints is not prejudicial based on a state court determination, and that's why I'm having difficulty. But let's take a look at how Walker went through that. Before you do, I want you to have time to get to another part of your case. So answer this, but please, I'd like to ask you about another part of your case. Sure. Well, let's look at the factors that Walker sets out. The first factor it sets out is, what was the device, and was it visible? And they say, in Walker's case, it was a leg brace. It was under his clothes. I understand the facts are different. What I'm saying in Walker is Judge Silverman walks through the state court determination and says, based on the facts of it, it's not unreasonable. And my question is, you've got to walk us through the state court determination here. I think you've tried to. And tell us why it's unreasonable, not why it's wrong. I think it's wrong, but why it's so unreasonable that no reasonable jurist could come up with it. It's unreasonable for two basic reasons. Number one, shackles don't imply remorse. And it defies common sense to think that all jurors would so conclude. Secondly, the state court totally ignored the fact that shackles, and this is case law that goes back to old England, to common law, that shackles imply dangerousness, and they say things about a defendant's character can't work against. Counsel, doesn't the fact that eight of the nine Washington Supreme Court justices disagree in terms of the result on this suggests that reasonable people can find it appropriate? You make it sound like if you think that's reasonable, then you're an absolute idiot. Nobody could possibly agree that way. Aren't you saying that the eight of the nine Washington Supreme Court justices are idiots? I'm saying that, no, I would never say that. Let's transfer it back to Elizabeth. It doesn't work that way. We used to get reversed when I was on the state court and we were 5-0. Here's what I'm saying. I'm saying that the state court decision stands alone, that there is no other case in United States jurisprudence, whether it's AEDPA or otherwise, that says shackles help in a remorse case and somehow dissipate the claim of future dangerousness, in a case where future dangerousness was one of the two issues that the jury had to decide. Let me redirect you, and I think this is well-briefed and well-argued, but I want to redirect your attention to a part of the case that troubles me, and I want to see if I understand it correctly. And I'm thinking now about what I'm going to call the brain damage issue. Yes. As I understand the record, and I want you to tell me if I'm wrong on this, defense counsel investigated and made a reasoned decision not to put on mental health evidence, and you don't challenge that in this procedure. We're not challenging the defense's failure to put on the evidence they had in hand. Let me go on. I think we're saying the same things. I don't want to take up more of your time than necessary. But a defense counsel never investigated the issue of brain damage, and that you had in the state personal restraint proceedings, you put on experts to say that that fell below the standard, and you put on evidence to show that had he done so, some expert at least would have said there was brain damage. I'm having difficulty, and this is the question I want to ask you, figuring out whether the Washington Supreme Court actually dealt with that issue. The dissent surely did. Did the Washington Supreme Court deal with that issue? Because if it didn't deal with it, maybe perhaps one level of review is appropriate, and if it did, another is. So can you tell me whether it did, and if so, where? Yeah, I would argue that it didn't. What the Supreme Court did with respect to this component of IAC, and it's true with other components, is to say that counsel wasn't deficient for failing to put on the evidence they had in hand. In other words, to present. And as to that one, that can be a strategic decision. Not all strategic decisions are non-strickland, but that can be a strategic decision. But we don't challenge that. We're not saying that they should have called Dr. Kleinknecht, for instance, who was the expert. We're in the same wavelength here. I understand the difference between the two. I'm asking you a very specific question. Did they deal with this? No. And let me just draw it back to Mr. Elmore's lifelong exposure to neurotoxins. They don't even discuss that. Well, let me stop you there, because let's start with the brain damage.  The Washington Supreme Court's decision does reference brain damage, does it not? It does. And it notes, among other things, that Dr. and I'm probably butchering the name, Kleinknecht, said that if there were clinically significant brain damage, you would expect it to manifest in various ways. And he didn't find it manifesting. Now, that wasn't the end of what he said or the end of what the Washington Supreme Court said about it. But I think we should be clear that the Washington Supreme Court opinion does reflect awareness of this issue about brain damage and talks about it. If I suggested otherwise, I misspoke. And is it not fair to say that Justice Sanders, who went on at great length about all of this, and unless we say that the eight members of the Supreme Court that signed on the majority opinion didn't read the dissenting opinion, they were, of course, aware of the brain damage issue, were they not? Well, they were. My point was really about the neurotoxins, because you'll see in their opinion a brief description of the fact that he was exposed to neurotoxins. But the dissent talks about that at great length. And let me return to my question, because you still haven't answered it for me. I understand that the Washington Supreme Court may have been aware of the neurotoxin issue, because they do mention it. And the dissent mentions it. I'm asking you where they deal with it. Do you think that they deal with it in conjunction with the mental health issue? Because it's one thing to say that he made a strategic decision not to present evidence that he had. It's another thing to say that he made a strategic decision, which I don't think the record supports, not to even look for the brain damage evidence. Counsel's declarations were essentially, yeah, I wish I had, but I didn't. Tell me. I can read the record. What I'm having trouble with is the Washington Supreme Court's decision. Did it deal with this correctly or incorrectly? Or did it just not deal with it at all? Here's what I think the Washington Supreme Court does. They take this, and they put all of this under the umbrella of, did the trial team investigate, in any aspect, Mr. Elmore's mental health? So we've created a very big umbrella, right? Did they do any mental health investigation? The answer is clearly yes. They did a mental health investigation. They determined that he wasn't insane and that he was competent to stand trial, albeit after they had convinced Mr. Elmore to plead guilty. But they did a mental health investigation. But that wasn't the point of the post-conviction evidence. The point of the post-conviction evidence is he may not be mentally ill, and he's not a psychopath, and we don't disagree with that, but he's brain damaged. And as to that, they didn't do any investigation. And if I can go back to your point about Dr. Kleinkonig, here's what the findings of fact say. It's true that Dr. Kleinkonig said that he couldn't intuit any brain damage simply from talking to Mr. Elmore. But here's what the findings say, and Kleinkonig testified, if he had information about Mr. Elmore's prior head injuries and lifelong exposure to neurotoxins, he would have referred him for neuropsychological and neurotoxic testing. So, you know, the problem here is they failed to do the preliminary investigation. But let me again, let me accept the truth of your arguments for a second. I have a very, and I know you're running out of time, but I want to get your answer to this. Let's assume that we conclude that the Washington court made no findings on this issue, either of law or fact, or that it concluded unreasonably that this was a strategic decision as opposed to just an omission. What do we do? I think you review it de novo, because the state court hasn't spoken on the issue. Or do we ask, do we ask the- I mean, Harrington says that even if the court gives no reasons at all, you have to presume the reasoning behind the decision. Well, except the state court has given reasons. And they've given a clear conclusion, and they did it in the face of a dissent that laid out an argument with regard to toxins and brain damage, and they reached a different conclusion. Now, do we assume that the Supreme Court made no decision on that, or do we have to imply they made a decision and we stick in the reasoning? I think you can conclude one of two things. I think you can conclude that they misframed and then misapplied the law, because mental health evaluations are not one-size-fits-all. There's a difference between brain damage and mental illness, and they didn't explore the brain damage despite being told by counsel to do so. What law did they not follow with respect to the brain damage? What case do you cite that existed at the time that this case became final, which was in 1999 in that system? Well, I would cite to Wiggins. Wiggins was 2003. True. Later. But Wiggins was an AEDPA case. And Wiggins- Doesn't matter. Yes, it does, because Wiggins couldn't break any new law. Penholster says we can't use that. You can't use Williams, you can't use Wiggins, you can't use anything that was after this case was over. You have to look at what was going on at that time. And I'm interested to know what case law the Washington Supreme Court violated or the state trial court violated when it did not require him to do further investigation about brain damage. What's the case? I would say it's Strickland, but I would also say that it's Wiggins, because, again, Wiggins is an AEDPA case, so it can't break any new law. And Wiggins was tried in the mid-'80s. Mr. Elmore was tried- But let's go back again, because I still don't have an answer to my question. Let's assume, notwithstanding, it may be true to the contrary, that the Washington Supreme Court made an unreasonable determination of fact, which was that not putting on the brain damage decision was a strategic decision. And let's also assume that there was evidence in the state court proceeding that this might fall below the first prong of Strickland, reasonable standard of care, and there was some evidence that there might be prejudice. There's no findings about that in the state court proceeding. And so my question to you is, we can't determine de novo, can we, at this point, whether or not it fell below the standard of care, because there's no evidence on the other side from which we can look at that. We can't determine de novo whether there was prejudice. Is there some mechanism by which we can get this back into the state courts for them to determine that, or should we send it to the district court for him to determine that? Recognizing under pinholster, you don't get to put in any more evidence. I think you can find that the state court process was unreasonable for purposes of fact-finding, and I think you can find, just like in the Panetti case, that because the process was unreasonable, you shouldn't give deference to the facts and remand it for an evidentiary hearing. To whom? To whom? Remand it to whom for an evidentiary hearing? Pardon me? Remand it to whom? To the district court. For an evidentiary hearing? For an evidentiary hearing? Yes. Well, you got in all the evidence you needed to get in. You just don't like the fact that they ignored it. I don't like the fact that they ignored it, yes. I agree with you there. I think, I was gonna get to the other point. I think you can ask, what is the uncontested evidence about the standards of practice that existed at the time? Because there's only one piece of evidence about the standards of practice, and that's the declaration of Dennis Balski, which was never contradicted by the state. But here's my concern, and it's on prejudice again. I wanna get back to it. Okay. With all respect, this is an awful crime. The facts are terrible. I don't know how I could conclude, even if I were doing de novo review, that had this brain evidence been put in, brain damage evidence been put in, it is likely that your client would have received a different sentence. I don't know how we make that determination. No court has yet made it, and so I'm struggling with the issue of what do the federal courts do, even if you accept the first prong of Strickland with the second prong. And I may have taken you over, so please answer that. All right. You'll still have time for rebuttal. Thank you. I think there's a two-part answer to your question. The first thing is you don't look just at the brain damage evidence in isolation. Let's assume that I conclude that the Washington Supreme Court was perfectly reasonable on everything else but this issue, and this is the only issue I'm focusing on. How do I find prejudice? Well, I think you find prejudice by looking at all of the evidence that was presented in post-conviction, along with the evidence that was presented during the penalty phase, and then you have to look at the Washington statute, which is a peculiar statute, because it says, has the state proven beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency? So essentially, that there's zero mitigation. It's not a Wayne statute. Oh, no, no, no, no, no, come on. It's not zero mitigate. If beyond a reasonable doubt is zero, then we would affirm no criminal convictions. I accept the correction. But it is a unique statute in that it asks, has the state proven the absence of any mitigation? So it's not a Wayne statute. The absence of sufficient mitigation, sufficient mitigation, what we do in these cases is we say to 12 people, you decide. We're giving you all this evidence. Your decision is not reviewable. Nobody's gonna overturn it. You decide. So what I'm struggling with, and maybe there's no answer to it, is how do we decide that in this awful case, with terrible facts, that introduction of this information about brain damage would have likely have changed the result? And maybe you can think about that and come back and talk about it on rebuttal, but that's my problem with this. All right, and I'll add a note to that for you to think about, and I'm sure we'll hear from the state about this as well. What's the impact of that? I mean, we do have the strategic decision with regard to mental health evidence that defense counsel thought it might actually undermine the case by suggesting that this person was dangerous in the future, that whatever the mental problems were, they left him as somebody who might do something we would regret in the future. Brain damage somewhat points to the same direction, and so I want you to think about that and be able to speak to us as to why it is we think that might have made a difference. All right, thank you. And we will give you time for rebuttal, and now we'll hear from the state. May it please the Court, John Sampson, Assistant Attorney General representing the respondent. As the Court is aware, this case comes before the Court under EDPA, and the State Court's decision addressing first the ineffectiveness of counsel for not pursuing a mental defense and not further investigating mental defense, this Court's review is doubly deferential. And the Supreme Court did resolve the issue of whether counsel should have conducted further investigation into the issue of organic brain damage. The Supreme Court, and this is at... Tell me where. It's at excerpts of record 40, which is their decision. And tell me the page of the opinion because I've got the opinion rather than... Yes, Your Honor. It's at, under the Washington report, it's at page 258, and under the Pacific third report, it's at page 347. And what the, and the State Court is addressing the issue, and what they say is there's no question the defense team did investigate petitioner's mental health deficiencies. Rather, the issue is whether counsel's failure to conduct further evaluations amounted to deficient representation. We believe that it did not. The defense team made a strategic decision to not present mental health... Okay, so let's focus on that because if that's a finding of fact that the defense team made a strategic decision not to pursue further mental health stuff, how do you reconcile that with the declaration of counsel that never thought about it, wish I had, I guess I missed it? I guess it was my, he says, I guess it was my inexperience, I never did it. Well, Your Honor, I just... How can you make a strategic decision if you didn't even know to look for it? And then my second question, so you can answer them both at once, is strategic decisions can fall below the Strickland standard of care, can they not? I can decide not to put on DNA evidence because I think it's not really cool. I'd rather put on an eyewitness. That would, even though that's strategic, that would fall below the standard of care, wouldn't it? Not necessarily, Your Honor, and not to get too far aside. Is strategy a silver bullet here? Can't you have an inept strategy? You can have an inept strategy, Your Honor, but it is highly deferential and it's doubly deferential under... So return to the first part of my question. How can we have said he made a strategic decision not to pursue evidence that he had no idea would be helpful and had no idea about whether to pursue? That's what he says. Yes, Your Honor, and for further factual evidence, there is findings of fact by the trial judge in the reference hearing. This is at Excerpts of Record, Volume 1, page 88 to 93, where he sets forth counsel's reasonings why he decided not to further pursue and present mental health. And I think we all agree that's a reasonable decision. My question is if, as the experts said, mental health and brain damage aren't the same, it's death penalty 101 to look at brain damage. This guy hadn't a clue about whether to look for it, and therefore I have trouble figuring out how he made a strategic decision not to look for it. Counsel, can I, as part of your answer to my colleague, I would appreciate your reflections on Penholster, because it's almost on all fours. In Penholster, you had two lawyers who spent a total of 6.5 hours in total, in total, preparing a penalty defense. They decided strategically that they were gonna put on the mother, they were gonna put on some former colleagues. And it turned out that he'd been run over by his mother when he was two or three, by a car, crushed the front part of his head, he went through the windshield when he was eight, he started having epileptic fits when he was 12, all kinds of acts of things. None of that evidence was ever put on. The Supreme Court, reviewing the case under AEDPA, concluded that the strategic defense was enough. And the fact that they had not discovered this was enough. They referred to double deference. Whether we agree with the Supreme Court or not, what bearing do you think that the Penholster facts have on this case? Do you have a different answer for my question than Judge Smith gave? Well, Your Honor, I think that Penholster does apply. And I think that it shows that counsel's decisions to stop their investigation, even if they didn't know about neurological evidence and didn't know about brain damage, does not fall below the level of a reasonably competent attorney. As a matter of law. Because there was no factual development of this. The only evidence in the record from experts about the standard of care is that this falls far below the standard of care expected of capital defense counsel. So we have to conclude as a matter of law that the decision not to pursue this, no matter what the experts say, can't possibly be deficient. Your Honor, I think what you have to look at first is whether the State's Court's decision was an unreasonable application or strictly. And see, my question, it was slightly different than what my colleagues answered, and I think he's right about what he said, is whether or not we can conclude that defense counsel made a strategic decision. The whole Washington Supreme Court decision, in my view, on this issue, turned on probably an implicit conclusion that because he had figured mental health wasn't all that good, he made an implicit decision not to look for other things that might involve the head. And so my question is, is that a reasonable decision, given testimony of trial counsel, that I hadn't a clue about this brain damage stuff? Your Honor, it is, because what counsel said was the reason he stopped, there were a couple reasons he stopped. First, when he was giving, when he received the report from Dr. Roche and then had information from Dr. Klanknick, he learned that if they pursued a mental health defense, that would open the door to discovery and a lot of damaging evidence would be disclosed to the prosecutor. So counsel said, I've got a report from a doctor saying my client committed the crime, not because of mental illness, but because it's perfectly reasonable in light of that. We all agree, even the guys at the other table agree. Perfectly reasonable in light of that not to go forward. He has no idea what the brain damage evidence would show. How can he make a reasoned decision not to investigate it? Because Strickland says you either have to do a reasonable investigation or make a reasonable decision to stop your investigation. And here, if he had continued looking into organic brain damage, he didn't know at that point in time, you and counsel's performance at that point in time, he didn't know if he would get favorable or disfavorable evidence from further investigation. He was- He explained that he was concerned that if he dug into that subject, that'll encourage the state to dig into the subject. What did he think the state would have found if they dug into that subject? What evidence do we have as to what they would have found? Well, under Washington law, the state would have been allowed to have their experts evaluate Mr. Elmore. And Mr. Elmore had made damaging statements to his own experts. Counsel was afraid he would make those statements to the prosecutor's expert. Under Washington law, he would get a copy of Dr. Roche's report, which had evidence counsel believed was damaging to Mr. Elmore. In pursuit of brain damage defense, he would get copies of a report that dealt only with mental health? Yes, Your Honor, because you cannot, you can't really limit the discovery on a particular issue. The prosecutor would have had, and this was a very- So let's assume that it has damaging information, just for the moment. He doesn't know what the brain damage investigation will show. The brain damage investigation may turn up to be the best defense in the history of the world or the worst defense in the history of the world. By not pursuing it, remember he's not making the defense, he's only pursuing the defense. He just has to investigate it as he did with mental health. Why does investigating it open up his prior reports to the state? He can make a decision at the end of it not to put it on, but let's assume he investigates it and it's wonderful. Then he can live with the bad statements made to him. And that goes to the other factors, counsel, and the trial court found in the reference hearing. At that point in time, the case was starting to fall apart. Mr. Elmore did not want mitigation evidence presented. He did not want this dragged out. He threatened to act out in the courtroom if they presented an extensive defense. Counsel said we were playing a game of beat the clock and we were running out of time and he had to get this case to trial. And he testified in the evidentiary hearing that the reason he didn't conduct, he said he would have loved to have been able to spend all sorts of time investigating organic brain damage, but he was faced with the situation at the time of trial where his case was falling apart. And if he didn't get it to the jury, he was afraid he would have nothing. Do you agree that his testimony that I would have liked to have pursued this was a post hoc rationalization? It wasn't that at the time he thought about pursuing it, brain damage. He says he didn't even know about the defense. And then made a reasoned decision not to pursue it. What he was saying later is, wow, given the way I ran this case, even if I'd known about it, I wouldn't have pursued it. I disagree, Your Honor. It was not post hoc. He was saying this is what was occurring at the time. No, no, I'm asking specifically about brain damage. I understand that at the time he made a decision, let's stop because I'm frantic. I want to get this case in front of the jury as quickly as possible. I'm asking whether at the time he made a specific reasoned decision not to pursue brain damage. Or more importantly, is it even necessary that he do so? Did he have a duty to inquire into brain damage? He did not, Your Honor. First, Mike, I asked the question first. Did he make a decision or not? Your Honor, I think that he made a decision, maybe not specific to organic brain damage, but he made a decision, I'm not going to further investigate. And that's fair. The record supports that. Let me, let me, let me. Before my colleague goes on, I want to just finish this line of thought. In Pinholster, the Supreme Court took me as the author of the opinion to task on this basis. And it bears on what we're talking about here. It says that the Court of Appeals held the California Supreme Court had unreasonably applied strict them because Pinholster's attorneys were far more deficient than the attorneys in these various cases. The court drew from those cases a, in quotes, constitutional duty to investigate. And the principle that is, it is a prima facie ineffective assistance to counsel to abandon their investigation of the petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. And then they went on to tell in no uncertain terms that I was just flat out wrong. I think we can get consensus on that, can't we? I remember what they said. I think so. Judge Smith wakes up in the middle of the night and Pinholster goes through the room. Yes, Your Honor, and I think that what the Supreme Court is saying is that you have to presume counsel's decision was competent. It's not the burden of counsel to justify why they did not seek further investigation. It's the petitioner's burden to show that that decision was unreasonably deficient representation and more importantly under AEDPA, that the state's court decision that it was not deficient was itself unreasonable. Let me ask you a broader question. And I say this recognizing that this trial occurred in the 1990s, recognizing that you weren't responsible for it, recognizing that the state of Washington has able counsel in front of us. When I step back from this case, what concerns me, and I don't know what to do with it, frankly, is that we have a capital case in which a lawyer is appointed with absolutely no capital experience. He allows his client to appear shackled in front of the jury when an objection would have worked. He pursues no plea negotiations, although it looks like they wouldn't have been, and tells his client to plead guilty, something I've never seen in any capital case. And then he puts on brief and cursory mitigation about how sorry his client is that he did it. It's awful representation. I'm not quarreling with the Washington Supreme Court's prejudice findings, but what do we do with a capital case where we've got this sort of triple play of awful representation? Is it cumulative? Can we look at it in that context? Well, Your Honor, I respectfully disagree that it's not awful representation. Mr. Komorowski, this was his first death case, but he was the most experienced defense attorney for the county public defender's office. Is the state court limited to getting an appointing counsel from the county? No, Your Honor, and the state court has, since this time, established standards. I've looked at your standards, and they're quite good. I don't move them backwards to say that this is a problem, but we do have a capital defense is a specialized field. We have somebody who's never done it, doesn't conduct plea negotiations. When the penalty phase trial comes in, his guy comes in in shackles, and even the Washington Supreme Court says, that shouldn't have happened. And then when he gets to the penalty phase, he puts on a couple of judges to say, gee, when he was in front of me, he didn't seem all that. He seemed remorseful. How could the jury possibly do anything but sentence to death under those circumstances? Well, Your Honor, I submit that no matter what he did, the jury would have submitted Mr. Elmore to death. And that's what it says. Tell me why. Before you get there, counsel, will you comment on some of the things that counsel did do? For example, did he associate experienced capital counsel, two of them? Did he hire an experienced investigator? Did he hire some people who had also had capital experience? Did he hire jury consultants and impanel a sample jury to try to ferret out what would be the best possible defense of this gentleman? Yes, Your Honor, he did all those. And again, Mr. Komoroske and Mr. Heidel, who was the second chair, they were both very experienced attorneys, experienced in presenting criminal defense and mental health defense. He did consult with a trial consultation team that had mock juries, which is pretty revolutionary for a criminal case. He did refer Mr. Elmore to two psychologists. They never told him, you need to look at organic brain damage. And this court has held, in a Ninth Circuit case, pre-EDPA, that that doesn't matter. But the Supreme Court has never held that counsel can't reasonably rely on a psychologist. Isn't there evidence in this record that one of the experienced counsel that he associated or consulted said to him, you've got to look for brain damage in cases like this? Yes, Your Honor. So it wasn't the absence of the doctors telling him that. He had direct advice that this is something he should look for. He did have advice from an attorney. But again, the Strickland standard looks at the fact that not all attorneys are going to agree on the best way to try a case. And even an attorney who has not done a death case can be an experienced and be a very good attorney and represent a client. So is there expert evidence in this record in the state court proceedings that it conforms to the standard of care in capital cases not to investigate brain damage? Well, Your Honor, there's not. The only expert attorney who testified in state court was the defense attorney. We would not believe him. That's a separate issue. I'm just asking what's there. And there is no prosecution expert attorney who testified. What we did have was the testimony of the actual attorneys as to why they made decisions to what they did. And Strickland doesn't say there is a strict standard that has to be applied. What Strickland and Wiggins have said is that it's a standard of reasonableness. It's not the ABA guidelines. It's not the court's rule of ethics and court's rule of responsibility for an attorney. It's what is a reasonable. It's the professional norm, as Strickland says. But Strickland does not require that the court look at an expert. And in fact, I agree. I just didn't know. I couldn't tell whether there was one from looking at the record. And that was my question. No, Your Honor, there is not. There is not. Briefly addressing the prejudice prong of this claim, if counsel had, and again, there's a lot of focus on counsel's failure to investigate. That wouldn't matter if counsel made a decision never to present this evidence in the first place. Only if this evidence was presented at trial would the court look at whether or not this was prejudicial. And if it did that, it would have to look at was all the evidence, including the evidence the state would have presented in rebuttal, which was one of the things that counsel really wanted to avoid was a rebuttal case that had damaging evidence. So given that, and this is the point I've had difficulty with with your opposing counsel, so I want to ask you, let's assume against all your wishes we decide that we have to determine whether or not the absence of this evidence was prejudicial to Mr. Elmore. How do we do that? Do we do it de novo? Do we ask the trial court to look at it? Do we ask Mr. Elmore to go back and exhaust that question in the Washington courts? Procedurally, how do we do that? Yes, Your Honor. So if the court got to that point where it was looking at the prejudice prong, the court would be looking at it de novo at that point because you would have to find that the state court's decision on competence was unreasonable. Yeah, I'm assuming we get to that point. So what you would have to look at is all the evidence. You would have to look at the facts of the crime. You would have to look at the evidence counsel actually did present. You would have to look at the evidence that the state would have presented. Ourselves? Ourselves. We don't know what evidence the state would have presented, and it's not in the state court record. And Strickland and Penholster, we all agree on this, tells us that we're stuck with the state court record. Well, Your Honor, there is evidence in the state court record. Dr. Levine testified that he disagreed with the opinions of Dr. Watson and Dr. Woods. And he pointed out that their opinion was only that Mr. Elmore had a mild or mild to moderate brain damage, that he was acting under an emotional disturbance, which is not truly a psychological term, and that he had some limited capability of conforming his behavior to law. But there was also extensive evidence that he could conform to law, that what he did, and they would admit that what he did was premeditated. When he raped her, when he choked her, when he drove that nine-inch nail into her head, when he put the plastic bag over her head so that he wouldn't leave any tissue in his car, and then killed her with a sledgehammer, that was goal-oriented executive functioning showing premeditated intent. OK, and I'm aware of that testimony, and that's why I asked the question. Do you think we, in the first instance, should look at this and say, reviewing this record de novo, even if we find incompetence, we can't find prejudice? Or do you think we should ask the district court? You agree the Washington Supreme Court never addressed the prejudice issue. That's my understanding of reading the opinion. So do we ask the district court to address it, or do we somehow ask the state courts to address it, as perhaps by suspending proceedings while further review is sought in the state? No, Your Honor. This court would be the court that decides the prejudice issue, but only if it finds in the first instance. And you're not conceding that. And I'm not conceding that. And what would be the standard for finding prejudice? What's our measure there? It would be the de novo review under Strickland's prejudice prong, and the question would be whether there is a reasonable probability that but for counsel's errors, the outcome of the trial would have been different. So in layman's terms, if counsel had presented evidence, the jury would have sentenced him to life. And I submit that even under a de novo standard of review, pre-EDPA standard of review, he cannot make that showing. Because if you look at all the evidence, the jury still would have sentenced him to death. How do we do that? And that's part of my difficulty with jury decisions. Because really, if the other side had gotten only one juror, then he wouldn't have been sentenced to death. And so how do we make that determination? Do we make it as reasonable people? Do we try to figure out what would impress jurors? What do we do? That's a good question, Your Honor. I don't have a good answer, by the way, either. It's a decision that the courts have had to make pre-EDPA in Strickland cases that this court has to make on collateral review in federal criminal cases. It's a legal decision as to prejudice looking at the evidence. And it is a difficult decision. But I submit that in this case, based on the evidence that would have come in, both by the defense and the prosecution, and I would really submit that the prosecution's evidence really does strongly rebut any organic brain damage evidence. Counsel, given the fact that under Strickland, certainly under Penholster, the world that we review is a written record or an oral record based upon his confession, his lengthy confession to the police, describing in great detail what he did. We are as competent to review that record, are we not, as would be a district court. Because a district court would not be taking new evidence. It's not permitted to take new evidence. It's going to review what's in the written record. Exactly right, Your Honor. Isn't this the very kind of thing that we have to do in all kinds of cases where we're determining whether there could be fair-minded disagreement, whether any rational juror could have made a determination to go the other way, and so on. This is not that uncommon for us to do that, is it? It is not uncommon. And in fact, Your Honor, even in EDPA cases that involve non-death penalty situations, this court routinely can affirm a district court's decision on any basis apparent in the record. And the court has affirmed the denial of ineffective assistance counsel cases on the issue of prejudice, even though the district court never reached that issue. Do you have any cases you could cite to us? I know my colleague is troubled by that. If you have any cases, it might be good. I do not have those off the top of my head, Your Honor. Maybe give us a 20-AJ letter. Another counsel can give us the contrary, so that my colleague will have those. And me, too, of course. Certainly, Your Honor, yes. I will certainly do that, Your Honor. Unless the court has more questions on that claim, I can briefly address the issue regarding the restraints. Again, the issue is whether or not the state court's decision was an unreasonable application of then-existing Supreme Court precedent. At that time, there was no US Supreme Court case saying that it was constitutional error for the defendant to be restrained in the penalty phase. The state court's decision, therefore, cannot be an unreasonable application of Supreme Court precedent. And I will be doing, also, a 20-AJ letter regarding the Supreme Court's decision on Monday in Glee versus Frost, which had a very similar situation. There, the question was whether it was structural error for the court to limit, but not completely deny, counsel's closing argument. And what the Supreme Court said is, we had never reached this issue. The state court decision cannot be an unreasonable application. For that reason, his due process claim fails. The ineffectiveness claim on the restraints issue, the state court did make a reasonable determination that counsel's failure to object, although deficient, was not prejudicial, because it was an extremely brief observance of the defendant in shackles. And although my learned friend talks about first impressions, that's not the standard for determining whether or not there was prejudicial error. It's not, what was the jury's first impression? It is, looking at the case as a whole, is there a reasonable probability that for counsel's failure to object, the outcome would have been different? And in this case, there is not. This court recognized in Cox versus Ayers, the removal of restraints can actually suggest that authorities no longer consider him to be dangerous. And as counsel did make, he was surprised when he saw the restraints, but then he made a tactical decision, I'm not going to object, because the jury expects him to be in custody. So I'm not going to object on this one day to him being, and the lack of an objection goes both to show no constitutional error on the due process claim, and also goes to show a lack of prejudice. That is all I have. Unless the Court has further questions on any other issues, I would ask that the Court affirm the district's position. Yeah. I have one question. Do you think the lack of prejudice determination with respect to the restraints is transferable at all to the lack of prejudice determination with respect to the failure to present brain damage evidence? And I understand that the Court didn't do that one, but a lot of the things that it said in terms of the overwhelming nature of the evidence and things like that would be the same kinds of things it would consider, we would consider were we looking at that. Is there some transferability in those findings? That I do not know, Your Honor. I don't either, and that's why I asked you. I think the Court can consider those issues in determining prejudice. Whether or not under AEDPA, you can say that because they found no prejudice on one form of ineffective assistance, they would have also found no prejudice on the other. I don't think the Supreme Court has addressed that. And it's my understanding that if the Court has not reached a prong under Strickland, this Court's review, if it determines 2254-D is satisfied, then it's de novo. I think we all agree on that. Thank you. Thank you. Thank you. A way of explanation, there is work going on in the exterior of the building. We did tell them we had an argument at 930. It'd be a one-hour argument, so they started work at 1030. They're a little more precise than we are. But the sound system isn't picking it up, apparently, and we can hear you, so please proceed. Well, let me start with Judge Hurwitz's point. There is a cumulative error claim in front of the Court that's been certified. And I think you have to keep in mind that the failure to object to the shackles, which prejudices Mr. Elmore in some way, can also be read in combination with their failure not only to do the brain damage investigation, but to fail to investigate anything about future dangerousness. Remember, this is one of two mitigating circumstances that are specifically identified in the jury instructions. And counsel presents no affirmative evidence on it, despite the fact that it's his theory of the case. He does no investigation on it whatsoever, and then he fails to object to the shackles, which were put on by the jail guards, in a case where the jury deliberated for ten full hours, which case law says is a long time and suggests prejudice. But let me return then to the IAC question, and specifically the question about remorse. And I guess I want to try to move out of the pinholster zone of danger, because the defense theory in this case was that Mr. Elmore was remorseful. But they didn't even investigate that theory. Yes, they put on two judges, one of whom said he looked dejected, the other said he looked subdued. But they didn't talk to the people who had the most contact with Mr. Elmore. They didn't even investigate their investigator, who gave really gripping testimony about how remorseful Mr. Elmore was. Counsel said that he was afraid that if somehow by pursuing brain damage, that the jail chaplain and the jail guards would say that Mr. Elmore was not remorseful. Post-conviction, counsel spoke to those people. Counsel, what is the standard here? I agree that you strongly disagree with the approach that counsel took in this case. And you agree that he should never have done it. But if he made that determination, which is what he said he did, and the reasons for it because of the mock jury, the fact that he may not have done it in the way you did, does that mean he's violated the first prong of Strickland there? Well, I think that it does. But let's just narrow the focus to remorse. Because we don't disagree that remorse didn't have the potential to mitigate. It did, frankly. But let's look at what he actually presented and what he investigated. He presented two judges who said nothing remarkable. They said he was in front of me for a few minutes. One said he looked dejected. The other said that he was subdued. That's it. This is like pinholster's mother, right? That's all they presented. But then let's look. And that's all they investigated. So let's look at what was available to support their defense. And it's incredibly compelling. The jail chaplain, he felt so much remorse and so much guilt that in the beginning, he couldn't even talk about God. He was so ashamed. He felt he couldn't turn to God. He was convinced that even God couldn't forgive him. Donald Pierce, who was the jail sergeant, and they never talked to him either. He said, during the time that I observed Mr. Elmore, he was an emotional wreck. He was totally withdrawn, didn't seem to care about his appearance or well-being. In fact, Mr. Elmore was as emotionally upset as any prisoner I have ever observed. Mr. Elmore's lawyers never contacted me about the possibility of testimony. I would have testified to the facts stated in this declaration if I had been subpoenaed. Now, the state court makes the mistake and concludes that those people were spoken to. They were not, as their declarations clearly provide. Let's go back to the question I asked you to consider before. Let's assume you've got all this. And we conclude that counsel was deficient for not presenting it. And the state says, well, we would have presented contrary evidence. And some of it's in the record. How do we conclude that this likely would have changed the result, which is, I think, the burden you have under Strickland? Strickland is an objective inquiry of prejudice. The question under Williams v. Taylor is taking all of the post-conviction evidence and adding it to the evidence that was presented at trial. And adding in the evidence that the state would have presented and put into post-conviction review proceedings. Absolutely. And let's be clear. Dr. Levine agreed that Mr. Elmore was brain damaged. And he agreed that that was the investigation that needed to happen. There was some disagreement. On deficiency, he's fine. He just says, I'm not sure it made much of a difference in his conduct. And then the question is whether all of that new evidence put on the side of the table, I mean, measured against a defense case that took less than an hour. No, the defense case, you don't have to convince me the defense case was deficient. My question is, would an efficient one likely have resulted in? The question is ultimately, is whether your confidence in the death verdict is undermined such that you believe there's a reasonable probability that at least one juror would have voted for life if they had heard this evidence. That's the standard. I'm sorry we've taken you over time. Thank you. Thank you. We thank both counsel for your helpful arguments in the case. The case is submitted. We're adjourned.
judges: Clifton, Smith, Hurwitz